# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CRIMINAL CASE NO. 1:14-cr-00022-MR-DLH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| WARREN ROSSLYN NEWELL | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for New Trial [Doc. 30], and his Motion for Rule 29 Acquittal. [Doc. 32].

## BACKGROUND

On April 1, 2014, the Defendant was named in a Bill of Indictment and charged with two identical offenses. Each count charged the Defendant with possessing one round of ammunition on July 30, 2013 (a separate bullet for each charge), after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). [Doc. 1]. On April 4, 2014, the Defendant made his initial appearance and submitted a financial affidavit requesting the appointment of counsel. [Doc. 3 (sealed)]. The Magistrate Judge appointed counsel to represent the Defendant. [Doc. 5 (sealed)]. The Defendant was arraigned on April 9, 2014, and appeared for

a jury trial on June 23, 2014. [Docket Sheet]. The jury convicted the Defendant on both counts the following day. [Doc. 26].

On July 3, 2014, the Defendant filed a motion to extend the time within which he could file a post-verdict Rule 29 motion. [Doc. 28]. The Court granted such motion extending Defendant's Rule 29 motion deadline to July 22, 2014. [Doc. 29]. On July 9, 2014, Defendant filed his Motion for New Trial. [Doc. 30]. On July 22, 2014, Defendant filed his Motion for Rule 29 Acquittal. [Doc. 32]. The Government responded [Docs. 31 and 33] to the Defendant's motions and the Defendant's motions, therefore, are ripe for the Court's consideration.

## STANDARD OF REVIEW

I.    <u>Rule 29 Motion</u>.

When confronted with a post-verdict motion for judgment of acquittal, the Court must assess whether, taking the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. <u>See United States v. Higgs</u>, 353 F.3d 281, 313 (4th Cir. 2003) (holding that a conviction must be sustained if there is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt") (quoting <u>United States v.</u>

Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). The Court does not weigh the credibility of witnesses but must accept any such determinations made by the jury which are necessarily resolved by the verdict. See United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997) (holding that credibility determinations are reserved for the jury, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe) (internal quotation marks omitted); United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983).

II.    Rule 33 Motion.

A defendant's motion for new trial is a discretionary matter for the Court to resolve. A district court may order a new trial if the evidence weighs so heavily against the verdict that to deny a new trial would be contrary to the "interest of justice." Fed.R.Crim.P. 33(a). The Court's review is much more expansive when considering a new trial motion as opposed to an acquittal motion. "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985); in accord, United States v. Campbell, 977 F.2d 854, 860 (4th Cir. 1992).

**DISCUSSION**

I.     Defendant's Motion for Judgment of Acquittal (Rule 29).

In the light most favorable to the Government, the evidence considered by the jury was as follows.  Henderson County, North Carolina, deputy sheriff Josh Hopper was on duty July 30, 2013, when he noticed a gold-colored car in an area known for criminal activity.  [T. 119].  Hopper radioed in the license plate number of the car to the sheriff's communications center and learned that a "plate pickup order" had been issued for the tag.  Hopper testified that a "plate pickup order" meant the vehicle displaying such tag was presently uninsured and any law enforcement officer could seize the license plate. [T.120]. Armed with this knowledge, Hopper initiated a traffic stop of the gold-colored car.  The Defendant was driving the car at the time.  [T. 120].  Also in the car as passengers were Rebecca Heath and Joseph Duncan.  Hopper learned that the Defendant's driver's license was suspended and issued him a ticket for driving while his license was revoked.  [T. 122].  Then, according to his testimony, Hopper asked both the Defendant and Heath[1] whether he could search the car.  Both consented to the search.  [T. 123].

---

[1] Heath, apparently, was the owner of the vehicle. [Doc. 32 at 3 n.2].

In the trunk of the vehicle, Hopper located a black briefcase and then proceeded to ask the three occupants who owned the briefcase. [T. 124]. The Defendant claimed ownership of the briefcase. [T. 124]. Hopper opened the briefcase and found, among other things, a black mask, several gloves, several knives, and a silver-colored metal cylinder approximately 8 inches long. [T. 125]. Hopper testified that he had no idea what purpose the metal cylinder served. [T. 125]. Detective Westphal, who was assisting Hopper with the car search, opened the metal cylinder and discovered a .22 caliber bullet inside. [T. 126]. In the center of the butt-end of the bullet's shell casing was an indentation. Hopper noticed this indentation which enabled him to identify this particular bullet at trial. [T. 133]. The officers then arrested the Defendant on the scene and transported him to the Sheriff's Department.[2] [T. 134].

At the Sheriff's Department, Hopper read the Defendant his Miranda rights and the Defendant agreed to speak with the deputies. [T. 135; 148]. Hopper testified that when he asked the Defendant about the metal cylinder, the Defendant referred to it as a "zip gun" and stated that he obtained it from a person named Kelly Brown two to three days prior. [T.

---

[2] During the stop, the Sheriff's communications center notified Hopper that Heath had outstanding warrants for her arrest. She, too, was taken into custody and transported to the Sheriff's Department along with Defendant. [T. 134].

136; 140]. The Defendant said he needed the zip gun for protection. [T. 136]. In speaking with the deputies, the Defendant further stated that he attempted to fire the zip gun but it did not function. [T. 137]. The Defendant told the officers the zip gun was missing a part that would make it fire properly. [T.138].

Hopper told the jury that when he and Westphal were finished questioning the Defendant, one of them asked him to write a statement summarizing their discussion and he agreed to do so. [T. 138]. After the Defendant finished writing his statement, Hopper compared it with what the Defendant told him and Westphal. Hopper testified that the Defendant's written statement did not coincide with what he had stated previously. [T. 140]. In particular, Hopper testified that the Defendant referred to the metal cylinder as a zip gun during their discussion and told the officers he knew it was contained in the briefcase. According to the Defendant's written statement, however, Hopper testified that the Defendant described the device merely as a "mechanism" (never mentioning the phrase "zip gun"), and that the Defendant further wrote that Kelly Brown put the mechanism in the briefcase in the trunk of the car and that he (Defendant) did not know anything about it until Hopper seized it during the traffic stop. [T. 140-46].

Upon the Defendant's completion of his written statement, Hopper walked him over to the detention center. [T. 163].

Hopper testified that he handed the Defendant over to Detention Officer Brian Helton at the detention center. Helton testified that upon meeting the Defendant and Hopper, his first duty was to conduct a thorough search of the Defendant before taking him into the detention center. [T. 164]. Helton stated that when he checked the Defendant's front right pants pocket, he retrieved a small number of coins and a .22 caliber long rifle cartridge. [T. 165]. He said the bullet appeared to him to be a live round and that he immediately handed the bullet to Hopper so that Hopper could maintain custody of it. [T. 168].

Approximately eight months later,[3] on April 3, 2014, AFT Agent Mark Gage, Task Force Officer Scott Hawkins, and Henderson County Deputies Hopper, Westphal, and Brezillac converged on a motel in West Asheville to affect the arrest of the Defendant based on the Indictment filed in this matter. [T. 180-84]. With the Defendant at that time was a woman named Priscilla Hoffman. [T. 174]. Hawkins arrived first as he had the Defendant under surveillance from a restaurant parking lot across the street from the hotel. [T. 172]. When he observed the Defendant and Hoffman walk out of

_____

[3] The record does not disclose when the Defendant was released from the Henderson County Detention Center following his arrest on July 30, 2013.

a hotel room and get into a car, Hawkins activated his blue lights and drove his unmarked car across the street to the hotel and parked it perpendicular to the passenger side of the vehicle the Defendant had just entered. [T. 173]. Hawkins got out of his car and ordered the Defendant to put his hands up. [T. 173]. The Defendant raised one hand but kept his other hand lowered. [T. 174]. By this time, Gage had arrived on the scene and assisted Hawkins in extracting the Defendant from the car and placing him in handcuffs. [T. 183].

According to Gage's testimony, following the Defendant's arrest, he read the Defendant his rights and the Defendant consented to speak with him in the hotel room away from Hoffman. [T. 184]. Gage took the Defendant into the hotel room followed by Hopper and Westphal who had recently arrived at the hotel. [T. 185]. The Defendant began by telling the officers that he did not raise both of his hands, as directed by Hawkins, because Hawkins was in an unmarked car and the Defendant knew of instances when people in the drug business were robbed by others posing as the police. [T. 185]. The Defendant then said he was the "muscle" for several drug dealers meaning he collected their debts. [T. 185-86]. When asked about the metal cylinder he had been arrested for the previous year, the Defendant said he received it from Kelly Brown. [T. 186]. The

Defendant said Brown gave him the zip gun together with one or two bullets, one of which was found in his pocket at the detention center. [T. 186]. Gage then took the Defendant to the Buncombe County Detention Center. [T. 187].

The following day, April 4, 2014, Gage and Hopper brought the Defendant from the detention center to the federal courthouse in order for the Defendant to make his initial appearance. [T. 187]. Gage testified that while the three men waited 15 to 20 minutes for the U.S. Marshal to allow them to enter the courthouse, the Defendant spoke further with the officers. The Defendant said that he knew he could not possess a firearm due to his criminal record. He also said that, because of his job as a drug debt collector, if he anticipated that a particular collection effort might require a firearm, he would bring someone else along with him to carry the firearm. [T. 190]. The Defendant was then taken inside the courthouse to make his initial appearance shortly thereafter.

As one of its last witnesses at Defendant's trial, the Government called ATF Agent George Rogers. [T. 212]. Without objection, Rogers testified as an expert "in the subject matter of the examination of firearms and ammunition and the interstate nexus research as well." [T. 216]. Rogers testified that, based upon his knowledge and research, and the

unique headstamp letter "F" on the shell casings, the two .22 caliber bullets seized from the Defendant were not manufactured in the State of North Carolina but were made by the Federal ammunition company in Anoka, Minnesota. [T. 226]. Rogers also testified that the bullet taken from metal cylinder had an indentation in the center of the butt-end of the shell casing previously described by Hopper. Rogers testified that civilian .22 caliber ammunition is rim-fire, meaning that the primer is contained in the rim of the shell casing and not in an individual module pressed into the center of the butt-end of a casing. [T. 225-28]. Rogers, therefore, opined to the jury that the metal cylinder did not function properly because the firing pin was striking close to the center of the butt-end of the .22 shell casing, and not its rim, thus failing to activate the primer. [T. 225-28].

In order to convict the Defendant for possessing ammunition in violation of 18 U.S.C. § 922(g)(1), the Government was required to prove beyond a reasonable doubt that: (1) the Defendant was a convicted felon; (2) he knowingly possessed ammunition; and (3) the ammunition he possessed had traveled in interstate commerce. United States v. Royal, 731 F.3d 333, 337 (4th Cir. 2013) (citation omitted). The parties stipulated at trial that the Defendant was a convicted felon. [T. 254]. The Defendant therefore challenges the sufficiency of the evidence supporting the other

two elements of the offense, Defendant's knowing possession of the ammunition and the ammunition's nexus to interstate commerce.

With regard to the "knowing possession" element, the Defendant raises separate arguments for each bullet.  Beginning with the bullet seized following the traffic stop of the gold-colored car, the Defendant asserts that the Government did not prove beyond a reasonable doubt he knowingly possessed the bullet found in the metal cylinder located in the trunk.  The Defendant claims the evidence at trial showed that the vehicle he was driving was not owned by him and that no evidence tied him to the black briefcase found in the trunk of that car in which the metal cylinder and bullet were contained.  [Doc. 32 at 3].

The Defendant, however, overlooks the uncontested testimony of Hopper who testified that the Defendant told him that he owned the briefcase.  Further, the Defendant told Hopper that a person named Kelly Brown gave him the zip gun seized from the briefcase along with the ammunition and that he (the Defendant) tried to fire the zip gun but it did not fire. The bullet retrieved from the zip gun had an indentation consistent with a firing pin strike in the center of the butt-end of the casing, consistent with Defendant's statement.   This evidence, taken in the light most favorable to the Government, shows that the Defendant admitted he knew

there was a bullet in the zip gun – the bullet that was not expelled when he attempted to fire it. The Defendant admitted to knowing he had the zip gun in the briefcase, and he admitted the briefcase was his. It was found in the trunk of the car he was driving. This is sufficient for the jury to reasonably infer that the Defendant was in constructive possession of both the briefcase and its contents, including the zip gun and the bullet.

Turning to the second bullet, the round seized from the Defendant's pants pocket, the Defendant argues that since Hopper failed to notice this bullet when he frisked Defendant following the traffic stop, it was equally likely that the Defendant himself did not know he possessed this bullet. [Doc. 32 at 4]. Considering the competent evidence admitted, the jury could draw the reasonable inference that one knows what one has in one's pockets. Hopper's failure to find this bullet when he searched the Defendant following the traffic stop is understandable from the standpoint that a Terry frisk is a pat-down meant to alleviate an officer's fear that a suspect might possess a gun, a knife, or some other weapon imminently harmful to him. Terry v. Ohio, 391 U.S. 1, 29 (1968) (the sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden

instruments for the assault of the police officer). The cursory manner of such a search is also the reason a detention officer conducts a more thorough search of a defendant before he or she enters a detention facility.

In addition, the testimony of Agent Gage supports the inference that the Defendant knowingly possessed the second bullet.  Gage testified that the Defendant told him that when he (the Defendant) received the zip gun from Brown, Brown also gave the Defendant one or two bullets to go with it, one such bullet being the round found by Helton at the detention center. The Defendant never challenged Gage's testimony on this point. Based on this testimony, it was reasonable for the jury to infer that the Defendant possessed the bullet from the time Brown gave it to him until the time it was seized from his pocket at the detention center. The Court is bound by the jury's credibility determination in this regard. For these reasons, a rational trier of fact could easily have found beyond a reasonable doubt that the Defendant knowingly possessed both .22 caliber bullets.

The Defendant's second argument for acquittal stems from his claim the Government failed to prove the third element of the offense – that the ammunition traveled in or affected interstate commerce.  [Doc. 32 at 4]. The Government's proof in this regard came from the Government's ammunition expert witness, Rogers, who testified that each of the two

bullets had a unique headstamp letter "F" on the shell casings. He further testified that ammunition bearing this unique headstamp is not manufactured in the State of North Carolina but is made by the Federal ammunition company in Anoka, Minnesota. The jury was therefore permitted to draw the reasonable conclusion that the two bullets at issue in this case must have traveled in or affected interstate commerce since they were made in Minnesota and ultimately possessed in North Carolina by the Defendant. For this reason, a rational trier of fact could easily have found beyond a reasonable doubt that this third element was fulfilled. Based upon the foregoing, the Defendant's Rule 29 Motion for Acquittal is denied.

II.    <u>Defendant's Motion for New Trial (Rule 33)</u>.

        Before discussing the substance of the Defendant's new trial motion, the Court pauses to address an issue about this motion unmentioned by the Government:  the timeliness of Defendant's new trial motion.  Rule 33(a) states, in pertinent part, that upon "the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.R.Crim.P. 33(a). The time period within which to file a new trial motion is governed by the basis therefor. "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."  <u>Id.</u> 33(b)(1).  "Any motion for a new trial

grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Id. 33(b)(2). In this matter, the Defendant's basis for requesting a new trial arises from the Court overruling certain evidentiary objections the Defendant made during trial. [Doc. 30 at 3]. As such, the Defendant's basis for seeking a new trial is not because of any "newly discovered evidence." The Defendant, therefore, had 14 days to file his new trial motion following the jury's verdict of guilty rendered on June 24, 2014. The Defendant filed his motion July 9, 2014, which was beyond the deadline.

Due to the untimeliness of Defendant's Rule 33 motion, the Court cannot proceed to resolve it if the 14 day filing period is "jurisdictional" in the strict sense of the word. The Supreme Court resolved[4] precisely this issue in Eberhart v. United States, 546 U.S. 12 (2005). There, the Court held that "Rule 33, like Rule 29 and Bankruptcy Rule 4004, is a claim-processing rule[.]" Id. at 19. Further, the Court explained, "[t]hese claim-processing rules thus assure relief to a party properly raising them, but do

---

[4] The Fourth Circuit has issued conflicting opinions on this issue. Cf. United States v. Smith, 62 F.3d 641, 648 (4th Cir. 1995) (the time limits set forth in Rule 33 are jurisdictional) and United State v. Barbee, No. 12-4197, 542 Fed.Appx. 15 (4th Cir. 2013) (unpublished) (same), with Rice v. Rivera, 617 F.3d 802, 809 (4th Cir. 2010) (recognizing that Rule 33 is a nonjurisdictional claim-processing rule). While the Smith decision preceded Eberhart and thus would seem to have been overruled, the unpublished Barbee opinion cites directly to Smith as binding authority without recognizing or mentioning either Eberhart or Rice. In light of Eberhart it would appear that Barbee is incorrect.

not compel the same result if the party forfeits them. Here, where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense." Id. In this matter, like in Eberhart, the Government may have purposefully declined to raise the defense of untimeliness since the Defendant's motion was only one day late. Accordingly, the Government has forfeited any objection to the Defendant's untimeliness and the Court will address the merits of his motion.

The Defendant argues that he is entitled to a new trial because the admission of evidence regarding his working as the "muscle" or debt collector for drug dealers constituted reversible error. According to the Defendant, this evidence was inadmissible because it was not intrinsic to or even relevant to the crimes charged and thus the interest of justice demands vacating the jury's verdict tainted by such evidence. Alternatively, the Defendant argues that if such evidence was permissible "intrinsic acts" evidence, it nevertheless failed the Rule 403 balancing test and the resulting substantial prejudice infected the jury deliberations to such an extent that a new trial is warranted. [Doc. 30 at 3-4].

In short, the Defendant's admission that he needed protection because he worked for drug dealers was an admission of his *reason* for

possessing the bullets at issue in the Indictment. As such, it is relevant because, by this admission, the Defendant himself excludes accidental or innocent possession of the ammunition and thus his statement is inculpatory. Addressing the more detailed arguments raised by the Defendant, the Court begins by clarifying that the evidentiary issue regarding the Defendant's collection work for drug dealers does not implicate Federal Rule of Evidence 404(b). Rule 404(b) dictates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Rule 404(b), however, applies only to limit the admission of other acts extrinsic to the conduct charged in the indictment. See United States v. Chin, 83 F.3d 83, 87–88 (4th Cir. 1996) (other criminal acts are considered "intrinsic" if they are "inextricably intertwined or both acts are part of a single criminal episode or other acts were necessary preliminaries to the crime charged"). In addition, evidence of other illegal acts or uncharged conduct is not considered "other crimes" for Rule 404(b) purposes "if it is necessary to complete the story of the crime [on] trial." United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) (citation omitted). In this matter, evidence of the Defendant's drug debt collection

activity was necessary to complete the story of the Defendant's ammunition possession.

After Hopper stopped the gold-colored car driven by the Defendant, the Defendant gave Hopper consent to search the car and claimed ownership of the black briefcase containing the zip gun and bullet. The Defendant argues that his later admissions, regarding his drug debt collecting business "are not inextricably intertwined, nor part of a singular criminal episode, nor necessary preliminaries to the possession of two .22 caliber bullets. These statements were made well after he allegedly possessed the bullets." [Doc. 30 at 3]. However, Defendant's statement that he received the zip gun and bullets for his own protection was initially provided without any further context and thus begged the question of why he needed protection. This could lead a jury to infer, consistent with the presumption of innocence, that his possession of them was for a permissible reason. In other words, the jury might conclude that the Defendant did not "knowingly" possess the bullets if it harbored a reasonable doubt that the protection about which he spoke arose from some legal necessity.[5] Even if a defendant chooses to do nothing during his criminal trial and puts the prosecution to its burden, "[e]vidence creating

---

[5] See Unites States v. Perrin, 45 F.3d 869, 873-74 (4th Cir. 1995) (setting forth the elements of the affirmative defense of justification).

a reasonable doubt could easily fall far short of proving [an affirmative] defense by a preponderance of the evidence." Martin v. Ohio, 480 U.S. 228, 234 (1987); accord Smart v. Leeke, 873 F.2d 1558, 1564 (4th Cir. 1989) (en banc) (evidence of an affirmative defense may unfold in the prosecution's case-in-chief or the prosecution's evidence presented may contain inherent weaknesses or ambiguity and thus raise in the mind of the jury a reasonable doubt). By saying that he needed the weapon and ammunition for protection without explaining why, the Defendant created a factual vacuum the Government was entitled to fill with intrinsic evidence. The "muscle" testimony, therefore, was properly admitted for this purpose.

With the Court having concluded that the evidence of the Defendant's drug debt collection activity was admissible for a proper purpose, the Defendant next argues that the testimony establishing this evidence should have been excluded because it was far more prejudicial than probative. "Evidence sought to be admitted in a trial must satisfy Rule 403's requirement that the probative value of the evidence must not be "substantially outweighed by the danger of unfair prejudice[.]" Fed.R.Evid. 403. According to the Defendant, this evidence was too prejudicial:

> In this balancing the evidence in question should not be more sensational and disturbing than the actual offenses for which Defendant is charged. Defendant's alleged possession of two .22 bullets pales in comparison to the portrayal of him as an

enforcer for local criminals. The jury, by being presented this evidence, was unfairly prejudiced against Defendant. The disturbing and sensational allegations regarding Defendant played upon the jurors' fears of what is ostensibly a violent and dangerous "profession". These emotions obscured the jurors [sic] ability to clearly and calmly determine if Defendant had in fact violated 922(g).

[Doc. 30 at 3-4].

The Court begins by recognizing the proposition that all incriminating evidence is inherently prejudicial. <u>United States v. Williams</u>, 445 F.3d 724, 730 (4th Cir. 2006) ("all evidence suggesting guilt is prejudicial to a defendant"). Therefore, Rule 403 speaks to the *unfair* prejudice of the proffered evidence *substantially* outweighing its probative value. The Defendant, however, fails to analyze this alleged unfair prejudice in the context of the substantial evidence against the Defendant.[6] Even if admission of this evidence were an error, as Defendant argues, an

---

[6] "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." <u>Williams</u>, 445 F.3d at 730 (internal quotation marks and alteration omitted). When focusing on <u>Williams</u>' disproportionate risk analysis, the Fourth Circuit suggests that one important factor to consider is whether the challenged evidence involves conduct more sensational or disturbing than the crime for which the defendant is being tried. <u>United States v. Boyd</u>, 53 F.3d 631, 637 (4th Cir. 1995) (defendant's personal use of marijuana and cocaine did not involve conduct any more sensational or disturbing than his charged offense of massive drug trafficking). In this matter, the Defendant argues that his admission of "muscle" activity on behalf of drug dealers was more sensational and disturbing than the simple facts establishing his possession of the two small caliber bullets. In light of the substantial evidence of Defendant's guilt, the Court need not decide this issue.

evidentiary error not affecting substantial rights can be deemed harmless if the Court concludes with fair assurance that the jury's "judgment was not substantially swayed by the error." O'Neal v. McAninch, 513 U.S. 432, 437 (1995) (citation omitted). To conclude that a jury's judgment was not substantially swayed by an evidentiary error, courts should first decide whether the evidence at issue was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates v. Evatt, 500 U.S. 391, 403, (1991). If a court decides the evidentiary error was "unimportant" in this way, its task is at an end.

In the present matter, the Defendant admitted that Brown gave him the zip gun and one or two bullets to go with it. He specifically recalled that one of the bullets given to him by Brown was the one found in his pocket by Helton. As for the other bullet, it was contained in the zip gun that was inside the black briefcase the Defendant claimed was his. Further the bullet in the zip gun possessed an indentation consistent with a firing pin strike. The Defendant himself explained the significance of this indentation by saying he tried to fire the zip gun but it did not function. Clearly, the Defendant would have loaded a live round into the zip gun when he attempted to test fire it. The bullet Westphal removed from the zip gun that

possessed the indentation was thus the other bullet Brown had given the Defendant.

Because the totality of unchallenged evidence overwhelmingly proved the Defendant unlawfully possessed ammunition, the Court concludes that if there was any error in admitting evidence concerning the Defendant's debt collecting activities it was harmless. Accordingly, the Defendant has failed to show that the "interest of justice" warrants granting him a new trial and his Rule 33 Motion for New Trial is denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for New Trial [Doc. 30] and Motion for Rule 29 Acquittal [Doc. 32] are **DENIED.**

**IT IS SO ORDERED.**

Signed: March 3, 2015

Martin Reidinger
United States District Judge